# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| RODERICK CRAIG, | ) | |
| | ) | |
| Defendant/Movant, | ) | |
| | ) | |
| vs. | ) | Case Numbers: |
| | ) | CR 01-S-119-S |
| | ) | CV 03-S-8005-S |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Roderick Craig ("defendant" or "Craig"), filed a motion pursuant to 28 U.S.C. § 2255, challenging his conviction and sentence. (Doc. no. 92).[1] He also filed a second motion challenging his sentencing as an armed career offender. (Doc. no. 103). For the reasons stated below, the court finds that the motions are due to be denied.

## BACKGROUND

Defendant was charged with being a felon in possession of a firearm after a police officer witnessed a pistol being tossed out of a car window next to the seat occupied by Craig. The grand jury returned a two-count indictment, charging

---

[1] References herein to "Doc. ___" are to the documents in record of this court in this matter.

defendant and Willie James Cook[2] with the crime of Felon in Possession of a Firearm, in violation of 18 § 922(g)(1).  (Doc. no. 1).  Defendant's case was tried to a jury and he was convicted.  At sentencing, the court determined that defendant was an armed career criminal under 18 § 924(e) and United States Sentencing Guideline ("U.S.S.G") § 4B1.4.  He was sentenced to serve a custodial term of 264 months.

Defendant retained new appellate counsel and appealed his conviction.  In an unpublished opinion filed August 29, 2002, the Eleventh Circuit Court of Appeals affirmed  defendant's conviction.  (Doc. 91).

In  the  present  motion  challenging  his  conviction  and  sentence  (doc. 92), defendant asserts that his counsel at trial and on appeal were ineffective.  Additionally, he challenges the unconstitutionality of the felon-in-possession statute (18 U.S.C. § 922(g)(1)) as applied in his situation.  In a "Motion for a Modification of an Imposed Term of an Imprisonment Due to an Intervening Change in Law or In the Alternative Motion for Preserved Error Review/Evidentiary Hearing" filed on August 31, 2005, defendant seeks to be resentenced without the career offender enhancement being applied.  (Doc. 103).  The court has treated the most recent motion as an amendment to the defendant's motion for relief pursuant to § 2255.

### STATEMENT OF THE FACTS

---

[2]Cook was charged in a separate count with illegally possessing a different firearm.  He entered a guilty plea to this charge on May 30, 2001.  *See* Pre-Sentence Investigation report ("PSI"), p. 2.

The evidence adduced during the trial of this matter revealed that on June 25, 2000, Officers Anthony McPherson and Jason Crocker of the Birmingham Police Department responded to a "shots fired" call at 5901 Warner Street, the residence of Willie Stokes, Jr. (T. Tr. at pp. 39-40, 109-10).[3]  The complainant informed the officers that someone had just driven by his residence and had fired shots at his house and car. (*Id*. at pp. 19-20).  Stokes told the officers that the individuals were riding in a white-colored Dodge Stratus. (*Id*. at pp. 18, 24, 27 & 40).

After taking the report, the officers left the Stokes' residence and resumed their patrol. Minutes later, as they were driving down a nearby street, the officers were flagged down by another citizen regarding a separate incident. (*Id*. at pp. 41-42). While talking with this complainant, the officers observed a car drive by their location fitting the description that had been given by Stokes. (*Id*. at pp. 42-43).  Because they were standing inside a fenced-in yard at the time, the officers were unable to give pursuit. (*Id*. at p. 43).  They were able to record the car's tag number. (*Id*.).  Although the officers attempted to locate the vehicle, they were not successful. (*Id*. at p. 44).

A short time later, Officers McPherson and Crocker heard that Officer Mark Balentine was dispatched to cover an accident. (*Id*. at pp. 44-46).  The officers were advised by the dispatcher that the accident occurred after gun shots were fired from

---

[3]The trial transcript is located at document 81 in the court file.

a white Dodge Stratus. (*Id*. at pp. 46-47). Anticipating that this car might be the same car that Stokes described earlier, McPherson and Crocker set up a surveillance in front of an apartment complex and waited. (*Id*. at p. 48).

Officer Balentine arrived at the scene of the accident and was met by the victim, Willie Stokes, Jr. (*Id*. at p. 280). Stokes told Balentine that he and his one-year-old son were on their way to pick up his wife at work when he noticed a white Dodge Stratus following close behind his car. (*Id*. at pp. 21-23). Stokes could not identify the occupants in the car. (*Id*. at pp. 29, 281-82). Stokes further informed the officer that as he sped down the Bessemer Highway, running red lights in order to get away, he heard gunshots. (*Id*. at p. 24). He then looked in his rearview mirror and saw an arm extending from the passenger window directly behind the driver's seat. (*Id*. at p. 24). One of these shots struck the rear window directly above his son's head. (*Id*. at p. 25, 145-46).

Officers Crocker and McPherson spotted the Dodge Stratus coming toward them a short time later. (*Id*. at pp. 50-51). They observed five individuals in the car. (*Id*. at p. 62). The vehicle slowed down and began to make a right turn. (*Id*. at p. 52). At that point, the officers pulled their vehicle in behind the Stratus and activated the emergency lights to effect a traffic stop. (*Id*. at p. 53). Crocker then observed a gun being tossed out of the window next to the front passenger seat, which was occupied

by Craig. (*Id*. at pp. 54, 61-62). He stated that the gun appeared to take a curved or "arched" trajectory as it left the vehicle and landed on the ground close to the roadway. (*Id*. at pp. 55, 287).

Moments later, the Stratus came to a stop. The suspects' car was then near the middle of the block, with the police car directly behind it. (*Id*. at pp. 54-59, 116-17). As the officers approached the car, Officer McPherson noticed the man sitting directly behind the defendant, later identified as Willie James Cook, kicking something under Craig's seat. (*Id*. at pp. 117-18). McPherson immediately ordered everyone out of the car. (*Id*. at pp. 118-19). Once the suspects were secured, McPherson reached under the front seat and retrieved a Charter Arms .38 caliber revolver. (*Id*. at p. 119). Officer Crocker later walked back toward the corner and retrieved another handgun, a Jennings Bryco .380 caliber semi-automatic pistol, that he had seen thrown from the window. (*Id*. at p. 64). When Crocker returned to the suspect's car, Craig spontaneously stated, "That ain't my gun." (*Id*. at p. 67).

Accompanying Craig and Cook in the car were three juveniles: Denario and Victor Smoot, Roderick Craig's nephews, and their cousin, Ira Craig. (*Id*. at pp. 207, 216, 247). Denario Smoot was driving the car when it was stopped. His brother, Victor, was sitting directly behind him, in the position from where, according to Willie Stokes, the gunshots had come minutes before. (*Id*. at p. 220).

Testing was later performed to determine whether either firearm had been used in the drive-by shooting. A firearms examiner with the Department of Forensic Sciences testified that the expended bullet had not been fired through the barrel of the submitted Charter Arms .38 caliber revolver, but that it could have been fired through the barrel of the submitted Jennings Bryco .380 pistol. (*Id*. at pp. 174-75).

## DISCUSSION

### Ineffective Assistance of Counsel

Defendant initially asserts that his Sixth Amendment right to effective assistance of counsel was violated when his trial attorney failed to call three witnesses. Specifically, he alleges that the testimony of three people — *e.g.,* an unnamed, "independent" eye-witness, a court-funded defense investigator, and the police department's radio dispatcher — would have benefitted his case. (Doc. no. 93 ("Memorandum") at pp. 5-9). According to defendant, the "independent" eye-witness would have testified that he (or she) had seen someone other than Craig throw the firearm from the car. (*Id*. at p. 5). Next, he asserts that the investigator would have cast serious doubt on whether Officer Crocker could have seen the defendant toss the gun out the car window. (*Id*. at p. 6). Additionally, he asserts that Crocker's testimony could have been undermined even further if his counsel had called the police dispatcher and questioned him as to the identity of the individual who called

in the information relating to the tag number on the Dodge Stratus that had been involved in the second drive-by shooting.  (*Id*. at pp. 8-9).  Finally, the defendant asserts that counsel engaged in unprofessional and/or unethical conduct with respect to two of these potential witnesses by arguing with one of them, and in "demanding money" for the testimony of the investigator.  (*Id*. at p. 6).

The guidepost for evaluating the substance of any ineffective assistance of counsel claim is *Strickland v. Washington*, 466 U.S. 668 (1984), in which the Supreme Court formulated a two-prong test for assessing whether the representation provided by an attorney during criminal trial proceedings constitutes "ineffective" representation under the Sixth Amendment.  The Court wrote:

> [A] convicted defendant's claim that counsel's assistance was so defective as to require a reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed that defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted in a breakdown of the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  To prove his ineffective assistance claims, the defendant is required to meet both the performance and prejudice prongs of the *Strickland* test, which is difficult.  As the Eleventh Circuit has noted, "the cases in which habeas

petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

Meeting the first prong is difficult, because "[j]udicial scrutiny of counsel's performance must be highly deferential," and courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. In discussing the first prong of *Strickland*, the Eleventh Circuit has said that:

> The Supreme Court ... mandated a highly deferential review of counsel's conduct, especially where strategy is involved. *Strickland v. Washington*, 466 U.S. 668, 689-90, 104 S. Ct. 2052, 2065-66, 80 L. Ed. 2d 674 (1984). Intensive scrutiny and second-guessing of attorney performance are not permitted. *Id.*; *accord*, *e.g.*, *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992) ("Most important, we must avoid second-guessing counsel's performance."); *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992) ("Courts also should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."). Because it is a "wide range" of performance that is constitutionally acceptable, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Cases in which deliberate strategic decisions have been found to constitute ineffective assistance are even fewer and farther between.

*Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994).

To meet the second prong, the petitioner "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.

The United States correctly points out that "complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is largely a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."  (Doc. 95 ("Response") at p. 10 (citing *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)).

Defendant asserts that the testimony of the court-funded investigator was essential to demonstrate that Officer Crocker, contrary to his trial testimony, was not in a position to observe the defendant throw the gun from the car.  (Memorandum at p. 6).  Defendant also asserts that this "scientific" evidence would have so challenged Crocker's credibility that "there is a strong probability that the jury would have found [him] innocent of the charge."  (*Id*. at p. 8).  Additionally, he asserts that counsel would not call this witness because neither Craig nor his family or friends would pay an additional sum of money (at least $1,000), which counsel allegedly demanded to ensure the presence of this witness at trial.  (*Id*. at p. 6).

Regarding the allegation that counsel engaged in unethical conduct by insisting that the family secretly pay her money, in addition to court-provided funds to ensure

the testimony of this witness, the defendant's trial counsel states in her affidavit as

follows:

> Contrary to my former client's assertion, I respectfully submit that I never threatened or in any way implied that I would not call any witness unless I or my investigator received additional money from either my former client or his family or friends.  I believe, however, that I did tell my client and his family and his girlfriend that this was not the "O.J." case, that the amount of money we had to investigate was limited to $1,000.00, so that they would have to help in the investigation. Furthermore, I may have told my client and his family, or his girlfriend that if we wanted the investigator to do more investigation, they would need to come up with money to pay him.  This was when the $1,000.00 in funds was either substantially depleted or used up completely. However, I adamantly deny that I ever said to Mr. Craig, his family, or his girlfriend that unless monies were paid, any witness would not testify.
>
> At no point did I fail to call a witness because of monetary considerations.
>
> . . . .
>
> I hired a company called Eyewitness Investigations to interview witnesses, take photographs, and to assist me in taking measurements.
>
> The two individuals with whom I dealt at Eyewitness Investigations were never retained to serve as experts.  They were not crime scene reconstructionist. [sic] They were hired to locate and interview witnesses, serve subpoenas, if possible at [sic] interview, take photographs, and assist me in taking measurements at the crime scene.
>
> The investigator who helped me take measurements would never have been called as an expert witness; as stated above, he is not a qualified crime scene reconstructionist, nor could [he] have testified as to what Officer Crocker could or could not have seen, as he was not present when the events at issue occurred.   After the $1,000.00 allotted investigator funds were exhausted, the investigator, as a favor to me,

continued to assist as an investigator without remuneration.  He even came to court during trial to continue volunteering his services.

I never, at any time, told Mr. Craig, his family, or his girlfriend that my investigator was a crime scene reconstructionist.  Further, I never relayed or implied that the investigator would be called to the stand to testify as any kind of expert, or to testify as to what Officer Crocker could or could not have seen at any point.  I would only have called the investigator to testify if the measurements which Officer Crocker and Officer McPherson had testified to had been out of line with the measurements my investigator and I had taken.  However, the testimony of neither officer was sufficiently divergent from our measurements to warrant the testimony of my investigator.  Thus, it would not have been reasonable or prudent to call the investigator, as his testimony would have been consistent with that of the officers, in terms of measurements.

(Bressler Aff. (doc. no. 96) at ¶¶ 9-16).

The United States recognizes that an attorney's effort to extort money from a client would be cognizable under § 2255 as bearing on the attorney's devotion to the client. *See Friedman v. United States*, 588 F.2d 1010 (5th Cir. 1979). The government contends, however, that "it is not necessary to explore this aspect of the issue given the second part of Craig's complaint —  the nature of the investigator's testimony. Counsel's performance, after all, need not be judged if the alleged error would not amount to sufficient prejudice." (Response at p. 12).  The court agrees.

In those portions of trial counsel's affidavit set out above,  she unequivocally states that she retained the services of two investigators; that they were not crime scene re-constructionists; and that she had never contemplated calling them as

"expert" witnesses.  (Bressler Aff. ¶¶ 13-16).  Additionally, and most importantly, the testimony regarding measurements would not benefit defendant.  To the contrary, the measurements tended to support the testimony of the officers.  Defendant has not offered anything beyond his conclusory allegations to warrant relief.  This is particularly true here, because courts disfavor second guessing counsel's trial strategy.  *See Chandler v. United States*, 218 F.3d 1305, 1314 n.14 (11th Cir. 2000).  In the absence of any prejudice to the defendant, he is entitled to no relief on this claim.

Concerning the failure to call the police dispatcher as a trial witness, the United States argues that "it is not necessary to scrutinize counsel's performance under the *Strickland* standard, as the alleged error would not have amounted to prejudice sufficient to warrant relief.  *United States v. DiMatteo*, 759 F.2d 831, 833 (11th Cir. 1985)."  (Response at p. 10).  The court again agrees.

Defendant argues that the credibility of Officer Crocker would have been brought into serious question if it was established that Officer Ballentine, the officer who responded to the drive-by shooting complaint, " .did not call in a tag number that matched the purported tag that [O]fficer Crocker took."  (Memorandum at p. 8).  Even if such testimony was available and presented to the jury, the impact would be insignificant because neither Crocker nor McPherson attributed the dispatcher's report to Ballentine.  What they did testify to was that they had heard the dispatcher issue a

report concerning the tag number of the suspect's vehicle and that this number matched the tag number that Officer Crocker had jotted down while investigating the first shooting incident.[4]  (Tr. T. at pp. 48, 113-14).  At best, this matter was collateral to Crocker's testimony and therefore would have little, if any, bearing on Crocker's credibility.[5]

Finally, defendant argues that his trial counsel failed to call an "independent eyewitness to the police stopping the vehicle and the firearm being tossed out of the window." (Response at p. 5).  Specifically, the defendant states that the witness "saw a person other than [the defendant] toss the firearm out of the car window." (*Id.*).  In contrast, counsel states in her affidavit that defendant's girlfriend, Jackie McRoy, provided her with the names, address, and telephone number of two teenagers, Tim and Brandon Roberson,[6] who supposedly had seen the driver of the vehicle, and not Roderick Craig, throw the firearm from the Dodge Stratus as the vehicle turned the

---

[4]The United States further notes that "[t]o be sure, Officer Ballentine would not have been dispatched to the accident scene until <u>after</u> the shooting had occurred.  By then, neither the suspects nor their car would have been in the area.  Common sense, then, dictates that Officer Ballentine would not have been in a position to see the tag number or call it in to police headquarters." (Response at p. 10).  The United States correctly goes on to also note that a third party observer may have conveyed the information.

[5]The court also finds that even if the defendant could show the requisite prejudice, he is still not entitled to relief because he has not demonstrated that counsel's performance was deficient.  The defendant's trial counsel notes in her affidavit that Crocker's recollection concerning the dispatch was corroborated by McPherson, who had provided the defense with favorable testimony.  (Bressler Aff. at ¶ 17).  Counsel decided not to challenge Crocker's recollection because by doing so she would negatively impact McPherson's credibility when he stated that he never saw the defendant throw a gun from the car.  (Bressler Aff. at ¶ 17).  As already stated, it is well-settled that a strategic decision, such as this, is generally not second-guessed by the court unless shown to be unreasonable.  *Waters v. Thomas*, 46 F.3d 1506, 1518-19 (11th Cir. 1995).  Accordingly, the defendant has failed to establish requisite deficient performance.

[6]According to counsel, the name she received from McRoy was "Roberson," not Robinson.

13

corner. (Bressler Aff. at ¶ 18). Counsel says that, despite repeated attempts, neither she nor her investigator were ever able to locate or interview these potential witnesses. (*Id*. at ¶¶ 19-21). The steps she took to arrange a face-to-face meeting proved unsuccessful and the telephone number that had been supplied to her was no longer in service. (*Id*. at ¶ 19). Counsel even attempted to set up a meeting with these witnesses through Jackie McRoy, but to no avail. (*Id*. at ¶ 21).[7] The defendant has not offered any affidavits from the purported witnesses despite the lengthy period to do so.

In light of the evidence before the court, including the witnesses' apparent disinterest in testifying at trial or in submitting an affidavit in support of the defendant at this juncture, the court is disinclined to fault counsel's performance under the circumstances. *See Williamson v. Moore*, 221 F.3d 1177, 1181 (11th Cir. 2000) (holding that an attorney's performance is not deemed deficient because she fails to call an unavailable witness). Additionally, the United States notes that, "although counsel was deterred in her efforts to secure the Robinson brothers, she was able to present the same evidence through the testimony of the defendant's nephews, Victor and Denario Smoot, who were with Craig at the time of the offense. The jury,

---

[7]This assertion is inconsistent with the affidavit of Jacqulin R. McRoy which provides that "Attorney Bressler got into an argument with the potential witness and parents, and that foreclosed securing this eyewitness of the vehicle stop." (Memorandum, Attachment, McRoy Aff. at ¶ 3). McRoy also stated that this "eyewitness had seen who within the vehicle tossed the firearm out, and this view was different from the police stance on the same facts." (*Id*.). Premised on the court's findings below on the prejudice issue, there is no need to make a credibility choice concerning these divergent facts.

14

therefore, did have an opportunity to hear and consider the defense's version of events, notwithstanding the absence of Tim and Brandon Robinson." (Response at p. 14). The court agrees, and specifically finds that the defendant has not demonstrated the requisite prejudice to meet the second prong on the ineffective assistance of counsel claim concerning these purported witnesses.

### Stipulation

The defendant next asserts that the stipulation entered into by his counsel did not satisfy the statutory language under which he was charged; and that the United States, therefore, did not prove this element of the crime. The defendant specifically asserts that the statutory language "in and affecting commerce" bears no relationship to the wording used in the parties' stipulation (*i.e.*, "had been transported"). Thus, he concludes that the stipulation "had nothing to do with in or affecting commerce as movant was indicted." (*Id.* at p. 11). Accordingly, he further asserts that his counsel was ineffective, and that her failure to later notice the error in her Rule 29 motion entitles him to relief. The United States retorts that the claim is without merit.

The defendant was indicted under 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm. The indictment states that the defendant did "knowingly possess in and affecting commerce a firearm." (Doc. 1). The elements for conviction require that the United States show: (1) defendant knowingly possessed a firearm; (2)

defendant was a convicted felon; and (3) the firearm affected interstate commerce.
*United States v. Deleveaux*, 205 F.2d 1292, 1296-97 (11th Cir. 2000).

In the present case, proof of the third element, the interstate nexus, was established through the introduction of a written stipulation, which included the language that "the United States of America. . .and the defendant Roderick Craig, by and through counsel Ellen Bressler, Esq.,. . .stipulate as follows: (1) That the firearm alleged to have been in the possession of Defendant. . . had, prior to June 25th, 2000, been transported in foreign and interstate commerce."  (Doc. 44 at  p. 1).

The interstate commerce nexus required in prosecutions when a felon is charged with possessing a firearm was examined by the United States Supreme Court in *Scarborough v. United States*, 431 U.S. 563 (1977), which involved a challenge to the predecessor felon-in-possession statute (18 U.S.C. § 1202(a)(1)).[8]   The Court addressed the question of whether proof that a firearm had previously traveled in interstate commerce is sufficient to satisfy the statutorily required nexus between commerce and the possession of the firearm by the convicted felon.  After examining the statutory language used by Congress, the Court said that it could " . see no indication that Congress intended to require any more than the minimal nexus that the firearm have been, at some time, in interstate commerce." *Scarborough*, 431 U.S. at

---

[8]That statute made any felon "who receives, possesses, or transports in commerce of affecting commerce. . .any firearm" guilty of a federal offense.  18 U.S.C. § 1202(a)(1).

16

575. Accordingly, it was only necessary that the prosecution demonstrate that the firearm had previously traveled in interstate commerce. *See United States v. Standridge*, 810 F.2d 1034, 1039 (11th Cir. 1987).

The United States argues that, "[b]ecause § 1202(a) is the forerunner of the current felon-in-possession statute, this statutory construction applies equally to § 922(g)(1). *United States v. Singletary*, 268 F.3d 196, 200 (3d Cir. 2001). It follows, then, that to sustain a conviction under § 922(g)(1) with respect to the jurisdictional element, all that is needed is evidence sufficient to establish that the firearm traveled in interstate commerce at some point prior to being possessed by the defendant. *United States v. McAllister*, 77 F.3d 387, 390 (11th Cir. 1996)." (Response at p. 16). The court agrees. The stipulation satisfied the prosecution's burden of producing evidence on this element. *See United States v. Hardin*, 139 F.3d 813, 817 (11th Cir. 1998) (holding that defendant's stipulation eliminated government's burden to produce evidence of the fact stipulated). Additionally, the difference between Craig's indictment and the stipulation is inconsequential. "The stipulation, though couched in the past tense, was sufficient to sustain the government's burden of proof with respect to the interstate nexus element." (Response at p. 17). Defense counsel's performance was not below the level of that required under the Sixth Amendment. Additionally, the defendant has not demonstrated any prejudice to support the second

prong under *Strickland*.  Absent a showing of prejudice (e.g., that the gun did not

travel in interstate commerce prior to its recovery), he is not entitled to any relief.

### The Jury Instruction

The defendant next challenges trial counsel's failure to object to court's jury

instruction dealing with the "interstate commerce" element of the crime.

(Memorandum at pp. 14-15).  The United States argues that this claim is without

merit.

The court instructed the jury that the determination of whether the firearm

possessed by the defendant was in or affected interstate commerce

> . . . is generally proven by facts showing that firearm moved
> across state lines from some point outside the State of Alabama to some
> point within the State of Alabama at which it was found or discovered.
> That fact also has been stipulated and, therefore, proven. . . .

(Supp. R. at p. 27).[9]  The defendant contends that this instruction "relied upon the

past-tense stipulation" and failed to inform the jury that it must decide whether his

alleged possession of the firearm was "either in or affecting interstate commerce."

(Memorandum at p. 14).

This claim is closely related to the last one.  Similarly, it is without merit.  The

United States correctly states that, "[i]n light of existing precedent, . . . the challenged

---

[9]The jury instructions are found in the supplemental record at document 83.

jury instruction was proper.  The statutory requirement that the firearm was in or affecting commerce is satisfied by demonstrating, 'that the firearm possessed by [Craig] previously had traveled in interstate commerce' (Response at p. 18 (citation omitted)).  The defendant has not demonstrated that counsel's performance was deficient or that he suffered any prejudice.  The claim is due to be dismissed.

### Ineffective Assistance of Appellate Counsel

The defendant next asserts that his appellate counsel was ineffective, because he failed to challenge: (1) the constitutionality of the jury instruction on interstate commerce; (2) the constitutionality of § 922(g)(1)'s interstate commerce requirement; and (3) the erroneous factual recitation mentioned by the Eleventh Circuit panel regarding the car tag reports.  The United States asserts that these claims are without merit.[10]

Generally, an ineffective assistance of appellate counsel claim is, like a claim against trial counsel, analyzed under the two-pronged *Strickland* test.  *See Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).

As discussed previously, the jury instruction regarding interstate commerce that was given by the court did not justify an objection from trial counsel or warrant

---

[10]The United States argues that the first two claims are procedurally barred because this is the first time they are being raised, the court finds this argument to be only partially correct.  To the extent that the defendant seeks to assert to raise substantive claims regarding the instruction and the constitutionality of the statute, the claims are procedurally barred since they were not raised at trial or on appeal.  To the extent that he is asserting that his appellate counsel was ineffective in not raising these issues, the claims are not barred.

further review on appeal.  The relevant instruction on the elements of the offense properly articulate the same.  The jurisdictional component stated by the court, and quoted above, accurately conveyed the controlling law.  There was no reason to contest the fact that the firearm had been transported in interstate commerce.  Accordingly, there was no error in failing to challenge the court's instructions on appeal.  *See United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) (appellate counsel is not ineffective for failing to raise claims reasonably considered to be without merit).  Additionally, defendant was not prejudiced by counsel's failure to raise this issue on appeal.

Defendant's next challenge to appellate counsel's performance similarly is without merit.  He asserts that counsel was deficient in failing to challenge the constitutionality of the felon-in-possession statute to the extent it allows for the "passive" possession of a firearm. (Memorandum at p. 17).  Defendant states that the recent decisions in *United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000); and *United States v. Jones*, 529 U.S. 848 (2000), change existing precedent.  He argues that the illegal possession of the firearm must have a substantial effect on interstate commerce in order to justify the proper application of the Commerce Clause.  (Memorandum at p. 21).

Congress is empowered "[t]o regulate Commerce . . . among the several States.

. . ." U.S. Const., art. I, § 8, cl. 3. The current felon-in-possession statute is premised on this authority. It provides that it is unlawful for any felon "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). The original statute regulating such offenses was codified as 18 U.S.C. § 1202(a). That statute made it unlawful for any felon to "receive[s], possess[es], or transport[s] in commerce or affecting commerce . . . any firearm." *Id*.

The interstate commerce requirement under § 1202 was examined by the United States Supreme Court in *United States v. Bass*, 404 U.S. 336 (1971) and *Scarborough*, 431 U.S. 563. In *Bass*, the Court held that "the commerce requirement in § 1202(a) must be read as part of the 'possesses' and 'receives' offenses." *Bass*, 404 U.S. at 350. In *Scarborough*, the Court stated that there was "no indication that Congress intended to require any more than the minimal nexus that the firearm have been, at some time, in interstate commerce." *Id*. at 575. Accordingly, the United States correctly asserts that it need only show, among other things, that the firearm possessed by the felon traveled at some time in interstate commerce. *See United States v. Singletary*, 268 F.3d 196, 200 (3d Cir. 2001) (holding that § 1202(a) is the predecessor to the present-day felon-in-possession statute, this statutory construction

21

dealing with § 1202(a) applies equally to § 922(g)(1).).

The issue in the present matter then is whether defendant is correct in his assertion that the more recent Supreme Court cases cited above have undermined the foregoing conclusion.  In *Lopez*, the Supreme Court was presented with a challenge to the Gun Free School Zones Act of 1990 (18 U.S.C. § 922(q)(1)(A)).  The Act made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone."  The Court held that Congress had exceeded its authority under the Commerce Clause in passing that legislation in that § 922(q)(1)(A) neither regulated a commercial activity nor contained a requirement that the possession of the firearm in a school zone be connected in any way to interstate commerce.  *Lopez*, 514 U.S. at 551, 567-68.  The Court also noted that, unlike the statute in *Bass* (§ 1202(a)), the Gun Free School Zones Act had "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce."  *Lopez*, 514 U.S. at 562.

In *Morrison*, the Court struck down the Violence Against Women Act (42 U.S.C. § 13981), which made it a federal crime if an assault was "committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender."  Relying on *Lopez*, the Court found the legislation unconstitutional

due, in part, to the fact that the violation "contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." *Morrison*, 529 U.S. at 611-12.  As noted by the United States, the same cannot be said for § 922(g)(1), because that statute specifically requires the necessary jurisdictional element under the Commerce Clause.  The fact that this element is included in the statute mandates that this court find the defendant's arguments to be without merit.  *See United States v. Dorris*, 236 F.3d 582, 586 (10th Cir. 2000) ("The jurisdictional element of § 922(g)(1) puts it into a different category of analysis than the laws considered in *Lopez* and *Morrison*.  Section 922(g)(1) by its language only regulates those weapons affecting interstate commerce by being the subject of interstate trade.  It addresses items sent in interstate commerce, and the channels of commerce themselves — ordering they be kept clear of firearms.  Thus, no analysis of the style of *Lopez* or *Morrison* is appropriate."); *see also United States v. Stuckey*, 255 F.3d 528 (8th Cir. 2001); *United States v. Gallimore*, 247 F.3d 134 (4th Cir. 2001); *United States v. Santiago*, 238 F.3d 213 (2d Cir. 2001); *United States v. Napier*, 233 F.3d 394 (6th Cir. 2000) (construing § 922(g)(8)); *United States v. Jones*, 231 F.3d 508 (9th Cir. 2000) (construing § 922(g)(8)); and *United States v. Wesela*, 223 F.3d 656 (7th Cir. 2000).

In *Jones*, the Court addressed a challenge to the application of the federal arson

statute (18 U.S.C. § 844(i)) to the destruction of a private residence.  The statute makes it a federal crime to damage or destroy, "by means of fire or an explosive, any . . . property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." *Id*.  The facts of the case showed that the defendant had tossed a Molotov cocktail through a window into a home in Fort Wayne, Indiana, that was owned and occupied by his cousin.  The defendant was indicted under the federal arson statute.  The Seventh Circuit affirmed the defendant's conviction on appeal, rejecting his contention that § 844(i), when applied to the arson of a private residence, exceeded the authority vested in Congress under the Commerce Clause. The Supreme Court reversed the conviction, holding that the statute "require[d] that the damage or destroyed property must itself have been used in commerce or in an activity affecting commerce."  The Court stated that § 844(i) "contains the qualifying words 'used in' a commerce-affecting activity.  The key word is 'used.'  Congress did not define the crime described in § 844(i) as the explosion of a building whose damage or destruction might affect interstate commerce."  *Jones*, 529 U.S. at 854. Accordingly, for the statute to be applicable and in accordance with the Commerce Clause, the house must be "actively used in commerce."  *Id.*

Unlike the arson statute, the illegal possession of a firearm statute at issue in this case (§ 922(g)(1)) does not have the same requirement.  It does not require that

the defendant's possession of the weapon substantially affect interstate commerce. It simply requires that the gun at some point travel or affect interstate commerce. *See United States v. Dupree*, 258 F.3d 1258, 1260 (11th Cir. 2001) (requiring a minimal nexus); *see also Santiago*, 238 F.3d at 216 (minimal nexus).

Since *Scarborough* was decided, the Eleventh Circuit has consistently followed the holding. For instance, in *United States v. Standridge*, 810 F.2d 1034 (11th Cir. 1987), the court rejected a challenge to § 1202, holding that *Scarborough* only required that the proof show that the firearm had previously traveled in interstate commerce. Similarly, in *United States v. McAllister*, 77 F.3d 387 (11th Cir. 1986), the court rejected a challenge to § 922(g)(1), stating that "[n]othing in *Lopez* suggests that the 'minimal nexus' test should be changed. Because the government demonstrated that the firearm possessed by McAllister previously had travelled [sic] in interstate commerce, the statute is not unconstitutional as applied to him." *McAllister*, 77 F.3d at 390. Finally, in *Dupree*, 258 F.3d at 1259-60, the defendant challenged the interstate nexus requirement under § 922(g). The court held that only a minimal nexus to interstate commerce must be established. It further stated that "by brandishing a firearm that was manufactured in California and found in his car, Dupree's actions satisf[ied] this test."

Premised on the foregoing, the court finds that the defendant's challenges are

due to be denied on these claims.

### Eleventh Circuit's Statement Regarding Matching Tag Numbers

The defendant next contends that the Eleventh Circuit improperly found the government's evidence to be sufficient for conviction when it erroneously concluded that the vehicle tag written down by the arresting officer matched the tag number mentioned by the police dispatcher following the second shooting. (Memorandum at pp. 14-15). He further argues that the record does not support this conclusion, and that appellate counsel should have raised it on appeal. (*Id*. at p. 15). The United States counters that the defendant's claim is premised on a misreading of the appellate court's opinion. and that it "never mentioned —  much less argued —  this fact on appeal." (Response at p. 27).

Concerning the first aspect, defendant is correct that the Eleventh Circuit did make a passing reference to the matching tag numbers; however, it did so only in the "Background" portion of the opinion. There is no mention of the matching tags in the section addressing the sufficiency of the evidence. It is clear that this did not impact the court's consideration of the sufficiency of the evidence. Under the circumstances, counsel cannot be faulted for not raising this issue on appeal. Additionally, the defendant has not demonstrated adequate prejudice to warrant any relief.

Concerning the second aspect, that the United States argued this evidence, the

United States responds that the evidence "was elicited merely for the limited purpose of explaining why the arresting officers took the steps they did after hearing the tag number information broadcast over the police department's radio. More importantly, this evidence had no direct bearing on the question of whether Craig illegally possessed a firearm as charged in the indictment. Thus, Craig's argument fails to demonstrate how this supposed lapse by appellate counsel resulted in any prejudice to him." (Response at p. 27). This court agrees. The information regarding the tag merely places the later events, including locating the car and the recovery of the weapon, in context. It was not substantive evidence of the defendant's guilt. This claim is therefore due to be denied.

### Career Offender Sentencing

In his "Motion for a Modification of an Imposed Term of an Imprisonment Due to an Intervening Change in Law or In the Alternative Motion for Preserved Error Review/Evidentiary Hearing," defendant seeks to be resentenced without the enhancement for being a career offender. (Doc. no. 103). The court has treated the motion as an amendment to the defendant's motion for relief pursuant to § 2255. Upon consideration of the same, the court finds that the defendant is not entitled to any relief.

Specifically, the defendant asserts that his sentence was improperly enhanced

as a career offender premised on three prior convictions.  In support of this contention, he cites *Shepard v. United States*, ___ U.S. ___, 125 S. Ct. 1254 (2005), in which, the Supreme Court held that police reports or complaint applications cannot form the basis for determining whether an earlier guilty plea supports a conviction of "generic burglary" for purposes of imposing an armed career criminal enhancement under the Sentencing Guidelines.

The Sentencing Guidelines provide that "[a] defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e) is an armed career criminal."  Section 924(e) provides, in pertinent part, as follows:

> (e)(1)  In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).
>
> (2) As used in this subsection--
>
> . . .
>
> (B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that–

> . . .
>
> (ii) is burglary, arson, or [sic] extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another; . . . .

18 U.S.C. § 924(e)(2)(B)(ii).  In *Taylor v. United States*, 495 U.S. 575 (1990), the

Supreme Court defined burglary for purposes of § 924(e)(2)(B)(ii) as follows:

> Although the exact formulations vary, the generic, contemporary meaning of burglary contains at least the following elements: an unlawful or unprivileged entry into, or remaining in, a building or other structure, with intent to commit a crime.[ ] *See* LaFave & Scott *supra*, n.3, § 8.13(a), p. 466 (modern statutes "generally require that the entry be unprivileged"); *id.*, § 8.13(c), p. 471 (modern statutes "typically describe the place as a 'building' or 'structure'"); *id.*, § 8.13(e), p. 474 ("[T]he prevailing view in the modern codes is that an intent to commit any offense will do").
>
> . . . .
>
> We conclude that a person has been convicted of burglary for purposes of a § 924(e) enhancement if he is convicted of any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime.

*Taylor*, 495 U.S. at 599.

The prior offenses that were used in the defendant's case include an Ohio

conviction for burglary, an Alabama conviction for third degree burglary, and an

Alabama conviction for third degree escape.  With regard to the Ohio burglary,

defendant asserts that it should not be counted because the factual basis for the same "showed the defendant was a resident of the dwelling" which was allegedly burglarized, and that there was "no forced entry to the premise." (Doc. 103 at p. 4 (citing PSI at ¶ 35)). The PSI provides in pertinent part as follows:

> The defendant was originally charged with aggravated burglary and theft. The theft charge was nolle prossed and the aggravated burglary charge was amended to burglary.

> According to Court records, at approximately 3:00 p.m., on July 24, 1992, the defendant entered the home of Wendy Woods and removed jewelry from that home. There was no forced entry to the premises. Ms. Woods learned through her own investigation "numerous pawn shops in the St. Clair area" that someone by the name of Roderick Craig had pawned jewelry belonging to her.

> According to a presentence report completed in this case, the defendant claimed to have been friends with Mr. and Mrs. Woods and had been staying with them "off and on." The defendant alleged that he had a key to their home in order that he could "go to the house and eat and to do whatever he wanted to do." The defendant admitted that he removed a great deal of Mr. Wood's jewelry and pawned it for over $100.00. According to the defendant, he was abusing narcotics at the time he committed this offense, and he stole the jewelry in order to pawn them and purchase additional narcotics.

(PSI at ¶ 35). Contrary to the defendant's assertions, the Ohio conviction constitutes a burglary under § 924(e) in that it includes the "basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Taylor*, 495 U.S. at 599.

Concerning the Alabama burglary conviction, defendant asserts in conclusory

30

fashion that this conviction "does not qualify as a crime of violence." (Doc. no. 103 at 5). The relevant statute specifically fits within the *Taylor* definition in that burglary in the third degree in Alabama occurs when a person "knowingly enters or remains unlawfully in a building with intent to commit a crime therein." ALABAMA CODE § 13A-7-7(a). The PSI provides that "[t]he defendant was originally charged in this case with Armed Burglary 1st Degree. He pled guilty to the charge of Burglary 3rd Degree."[11] (PSI at ¶ 34). That is sufficient to satisfy the requirements of § 924.

Lastly, concerning the use of the third degree escape conviction, the defendant asserts that the "facts in support of this prior served conviction merely established that the defendant 'walked away from a county jail.'" (Doc. 103 at p. 5). In *United States v. Gay*, 25 F.3d 950 (11th Cir. 2001), the court held that "a prior escape conviction qualifies as a 'crime of violence' under the career offender guideline. . . . even when it involves a 'walk-away' from unsecured correctional facilities." *Gay*, 25 F.3d at 954-55. Premised on the foregoing controlling authority, the court finds that it

---

[11]The court notes that the PSI also provides:

Alabama Board of Pardons and Parole records revealed that on December 16, 1990, at approximately 9:00 p.m., the defendant and Carlos Bailey broke into the residence of Clem Johnson at 100 Roosevelt Manor, Apartment #50, Bessemer, Alabama. The subjects kicked in the front door of the residence and took one Philco television valued at $168.00; one box of .38 caliber Smith and Wesson cartridges valued at $10.00; and Food Stamps valued at $15.00. A neighbor, Eddie Browder, who lives in apartment #48 heard a noise and stopped outside to see what was happening. Browder saw Carlos Bailey with the Food Stamps and a gun. Bailey told Browder, "you're the only who's seen us." The defendant was observed carrying the television.

(PSI at ¶ 34). Thus, the defendant cannot show any prejudice even if there was error.

properly used this prior conviction in sentencing the defendant.[12]

Because the foregoing convictions all properly constitute crimes of violence, the defendant was properly sentenced as a career offender under § 924(e) and U.S.S.G. § 4B1.4.  He is entitled to no relief on this claim.

### CONCLUSION

Premised on the foregoing, the court finds that the defendant's motions challenging his conviction and sentence (doc. nos. 92 and 103) are due to be denied. Additionally, the court finds his motions for an evidentiary hearing (doc. nos. 100 and 102) and to expedite this matter (doc. no. 3 in *Craig v. United States*, 2:03-cv-08005-CLS-JEO) are moot.  An appropriate order will be entered.

DONE this 23rd of November, 2005.

_____
United States District Judge

---

[12]The court does note however that the PSI provides that the defendant was an inmate at the Lipscomb City Jail and when a trustee opened his cell door in order to allow another inmate who was bonding out to leave the cell . . .  the defendant pushed the trustee out of the way and ran from the jail."  (PSI at ¶ 41).